UNITED STATES of America, Plaintiff–Appellee,

v.

Johnny Rudolph CHENAULT, Defendant–Appellant.

No. 87–4655.

United States Court of Appeals, Fifth Circuit.

April 27, 1988.

---

Grady Tollison, Jr., Oxford, Miss. (court appointed), for defendant-appellant.

Alfred E. Moreton, III, Asst. U.S. Atty., Robert Q. Whitwell, U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before THORNBERRY, WILLIAMS, and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellant Johnny Rudolph Chenault was indicted on two counts of knowingly submitting false documents in support of a claim with the intent to defraud the United States. 18 U.S.C. § 495. After a jury trial in the United States District Court for the Northern District of Mississippi, Chenault was convicted on both counts. Chenault appeals his conviction, arguing that the trial judge erroneously decided several evidentiary matters, that the venue of the trial was improper, that the trial judge improperly instructed the jury, and that the government failed to prove the charged offenses. We affirm the conviction.

I

On February 12, 1985, Chenault was awarded a $173,594 Defense Department contract to build 16,690 wooden pallets. The contract allowed Chenault to request monthly progress payments of 95% of costs.

On March 8, 1985, Chenault requested his first progress payment. He submitted the request, for $103,643 in costs, to the Defense Contract Administrative Services Management Area Office in Birmingham, Alabama. Along with his request, Chenault submitted a cash flow statement showing disbursements of $89,950, and five invoices for lumber and nails. The reviewing officer noted that Chenault had requested only 90% of costs ($93,279) rather than 95% of costs ($98,461) and notified Chenault that he could submit a corrected request. On March 14 Chenault submitted a corrected request for 95% of the costs listed on the March 8 request. The corrected request was approved and Chenault was paid $98,461.

Two of the invoices Chenault submitted with the March 8 request are questionable. First, Chenault had a $63,200 invoice from Foust Bandsaw Mill, Inc. for lumber costs. Mr. Foust, the company's only salesman, testified that although he had sold Chenault about $3000 of lumber, he had never discussed with Chenault an order for $63,200. Foust testified that it would have taken him several years to fill the order as stated in the invoice. Other evidence shows that Chenault obtained the invoice from Foust Bandsaw Mill's secretary by telling her that he needed a blank invoice to show the government how the invoice would be set up. Chenault, however, testified that he talked by phone with an unidentified man who agreed to supply the lumber at the above price. He testified that he asked the secretary to send him an invoice showing this commitment, but she sent him a blank invoice. He testified that all the money he received based on this invoice went into materials for the contract.

Second, an invoice in support of the progress payment from Southern Duofast Co. showed costs of $14,622 for nails. The evidence shows that Chenault asked Duofast to calculate the number of nails that would be needed for the contract, to store them at a warehouse, and to fill out an

invoice for them so he could obtain advance payment. Thus, Duofast prepared a delivery receipt for these nails and gave Chenault a copy. Duofast also prepared an invoice, but eventually canceled it. None of these nails were delivered to Chenault and he never incurred any costs on this delivery receipt. Later orders from Chenault to Duofast were listed on individual invoices and claimed on subsequent progress payment requests.

Chenault filed a second progress payment request dated April 18. This time he requested $34,460. The accompanying cash flow statement was supported by photocopies of several invoices. Like the first request, this request also contained an error—it included an ineligible $7000 cost—so the reviewing officer again notified Chenault that he would have to file a corrected request. Chenault made this corrected request and included a new cash flow statement that omitted the ineligible $7000. Thus, Chenault was paid $27,810.[1]

The dates were altered on several supporting invoices, totalling about $20,000, to reflect purchases before the April 8 cut-off date for the second progress payment. Two invoices, for $380, had both the dates and the amounts altered. Chenault testified that he changed the dates to meet the cut-off date to get money to keep his business going. He asserts that all of this money went into the contract.

The government found numerous problems with Chenault's performance under the contract. His costs were too high and, even though his delivery date had been extended by six months, he never delivered any pallets. Thus, the government terminated the contract on February 24, 1986. On March 10, the government inspected Chenault's pallets. Although he had reported in his progress payment requests that he had produced over 11,000 pallets, only 6,114 were found. Furthermore, these pallets were defective. Chenault, however, testified that he produced over 14,000 pallets and had only 6114 defective pallets on hand because of vandalism and theft.

After a jury trial, Chenault was convicted on both counts of a two-count indictment for knowingly submitting false documents in support of a claim, with intent to defraud the United States. 18 U.S.C. § 495. The court ordered him to pay restitution and sentenced him to three years in prison on count one and five years probation on count two. Chenault now appeals.

## II

Chenault first objects to the admission in evidence of certain statements he made to FBI agents during the investigation of this case. Ken Rust, an FBI agent, originally commenced the investigation of Chenault's contract after receiving a complaint from the Department of Defense. Rust knew that Chenault was a suspect for prosecution, and that there was a good chance that a charge against Chenault would be presented to a grand jury. Rust also knew that allegedly false documents had been submitted, but he had no idea how Chenault had obtained them or whether Chenault had altered them. With this knowledge, Rust talked with Chenault three times. The first occasion was when he and another agent, Jim Dunivant, advised Chenault of the investigation and requested certain documents. The second was when they returned the documents. The third was when they "interrogated" Chenault at his office. Prior to this third meeting, the agents had talked with some of Chenault's suppliers.

Chenault was not arrested during this third meeting. Nevertheless, this interrogation occurred only after the agents had obtained evidence against him, and they were trying to elicit direct evidence that could be obtained only from him. Chenault alleges that during the interrogation, Agent Dunivant stood, approached him, and then stated that denying that he had obtained and falsified the Foust invoice would be futile. Chenault asserts that this statement was coupled with insistent demands for admissions, intimidation, cursing, direct assertions of his guilt, and a

---

1. $34,460—($7000 × 95%).

recital of the crimes for which he could be indicted. He says that he was generally frightened and in particular afraid to leave the room, and that he did not know what would happen to him. Thus, he began answering all questions put to him. Chenault was not advised of his *Miranda* rights.

The government agrees with Chenault's general version of the events. It notes, however, that Chenault at no time indicated that he wanted the discussion to stop and that he seemed eager to talk. In fact, Chenault testified that he would have made the same statements even if the Agent Dunivant had acted less aggressively. Additionally, the agents twice told Chenault that he was not being arrested. The agents did remember standing and asking Chenault if he obtained and forged the invoice, but they did not recall using any curse words.

At trial, Chenault objected to the introduction of the statements he made at that third meeting. The trial court held a hearing on this issue. It found from the totality of the circumstances surrounding the questioning that no threats, coercion, or promises induced Chenault to talk. It found that the agents identified themselves, that Chenault expressed a desire to cooperate, and that Chenault was "an intelligent human who knew what he was doing." Further, the court found that Chenault was not in custody or deprived of his freedom during the questioning. Finally, the court found that Chenault was not detained by the officers to an extent sufficient to trigger the requirements of *Miranda*.

In this appeal Chenault argues that his statements should have been suppressed either because he should have been given *Miranda* warnings or because the statements were not voluntary and made without inducement or threat. *Miranda* warnings are necessary only when one is "in custody." *United States v. Alvarado Garcia*, 781 F.2d 422, 425 (5th Cir.1986). In *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977), the Supreme Court held that "a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' " Rather, the key question is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

This court has approached this issue of when custody exists by considering four factors: (1) whether there was probable cause for arrest; (2) whether the law enforcement officer had a subjective intent to hold the defendant; (3) whether the defendant had a subjective belief that his freedom was significantly restricted; and (4) whether the focus of the investigation was on the defendant. *United States v. Alvarado Garcia*, 781 F.2d 422, 425–26 (5th Cir.1986). No single element is dispositive on this issue. *United States v. Charles*, 738 F.2d 686, 693 n. 7 (5th Cir.1984). Rather, we must examine the entire set of circumstances to determine whether the defendant was formally under arrest or restrained in a manner similar to a formal arrest. *Id.* at 693.

■ Our examination of the factors as applied here reveals some evidence suggesting the presence of some of these factors. For example, the agents were nearing the end of their investigation, which focused on Chenault. From their discussions with Chenault's suppliers, the agents knew that the documents had been forged and that Chenault had control of them. As the agents stated, however, they did not know how Chenault had obtained or altered the documents. Thus, although the agents might have been nearing the end of their investigation, they cannot reasonably be said to have concluded it. Because investigation of these major elements of Chenault's part in the crime was incomplete, probable cause for arrest likely did not exist.

The agents twice told Chenault that they were not arresting him. Although Chenault now says he was afraid to leave the

room, he appeared eager to talk. He told Agent Rust that he wanted to talk to clear things up. Additionally, the questioning occurred in circumstances far less custodial than those in the Supreme Court cases in which custody was not found. *See, e.g., California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (holding that merely because questioning was designed to produce incriminating responses, took place at the police station, and occurred only after the defendant was identified as a suspect did not trigger *Miranda* ). Here, the questioning occurred in Chenault's office. Only in one instance did one of the agents approach Chenault. One agent perhaps swore at one point in the interview. At all other times, the questioning was accomplished in a calm manner with the agents taking notes. Chenault was familiar with the officers from their previous contacts and had never previously felt frightened when talking with them. At their prior meetings, the agents had neither arrested nor threatened to arrest Chenault. Most importantly, of course, Chenault was not placed under arrest and was expressly told that he was not under arrest. The agents never indicated to Chenault that he could not leave the room.

From the totality of these circumstances, we cannot say that Chenault was "in custody." Chenault was not formally under arrest and he has not shown that his "freedom was curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting *Beheler*, 103 S.Ct. at 3520). The agents did nothing that would cause a reasonable person to believe himself restrained from terminating the discussion and leaving the room. Therefore, the agents were not required to give the *Miranda* warnings.

█ Chenault's statements also must be suppressed if they were not given voluntarily. A statement is not voluntary if obtained by threat, violence, or a promise, and voluntariness is to be determined from the totality of the circumstances. *United States v. Barfield*, 507 F.2d 53, 56–57 (5th Cir.1975). Chenault asserts that his state-

ments were coerced by the agents cursing, shouting, accusing him of being guilty and of lying, and reciting the crimes for which he could be indicted.

The trial court, however, found that the statements were voluntary, and that finding is only to be reversed if clearly erroneous. *United States v. Williams*, 616 F.2d 759, 761 (5th Cir.1980). We see no clear error here. Whether a defendant is coerced by the belligerence of an officer is a credibility determination to be made by the trial judge. *Williams*, 616 F.2d at 761. The trial judge credited the agents' testimony over Chenault's in finding voluntariness. The agents twice told Chenault he was not being arrested, and they said they did not curse. Additionally, Chenault testified that he wanted to talk to the agents. We have held previously that a statement that the defendant should tell the truth does not usually render a statement involuntary. *Barfield*, 507 F.2d at 56. No other statements or actions by the agents can be said to have clearly rendered Chenault's statements involuntary. Thus, the conclusion of the trial judge that Chenault's statements were made voluntarily was not clearly erroneous. Therefore, the trial judge did not err in allowing Chenault's statements into evidence.

### III

During the trial, documents and testimony were introduced indicating that Chenault had sold to a third party 2000 pallets that had been built for the government. Chenault objected to this evidence, arguing that it was inadmissible evidence of a crime extrinsic to the crime charged and unfairly prejudicial. Fed.R.Evid. 403, 404(b). He argued that this evidence was brought in to show that he sold pallets belonging to the Defense Department, which would be the crime of larceny. Evidence of extrinsic crimes must meet the test of *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978): for such evidence to be admitted, "it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value

**1130**

that is not substantially outweighed by its undue prejudice...."

 This evidence was admissible because it was not used to show that Chenault acted in conformity with a bad character. Chenault testified that he had produced more than the 6000 pallets he had on hand, but that they had been stolen and vandalized. Chenault intended this evidence to support his primary defense that even though the documents may have been false, he nevertheless had no culpable intent because he intended to and did use the money to build the pallets, which were then lost through theft and vandalism. The evidence about the disposition of the pallets, of course, directly implicates that attempted defense. It shows that rather than having the benign intent to complete the contract for the government, he intended to defraud the government. *See United States v. Ackal*, 706 F.2d 523, 531 (5th Cir.1983) (holding that when defendant claimed he was involved in a legitimate business deal, evidence of a separate act of extortion was admissible to prove intent to commit fraud). Rule 404(b) expressly allows the admission of extrinsic acts evidence to prove intent. Additionally, the second prong of the *Beechum* test is met; the probative value of this evidence greatly outweighs any unfair prejudice because it proves a major disputed element of the crime. Although a limiting instruction might have been proper, Chenault does not raise that issue.

### IV

The court declined to give Chenault's requested jury instruction about a defense of good faith. The court instructed the jury, however, that it must find beyond a reasonable doubt that the defendant acted "knowingly and willfully with intent to defraud the United States." The court defined "knowingly" as "voluntary and intentionally and not because of mistake or accident," and "willfully" as "voluntary and purposely with the specific intent to do something the law forbids, ... with bad purpose either to disobey or disregard the law." The court further instructed that to act with

"intent to defraud" means "to act willfully and with the specific intent to deceive or cheat ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self." Finally, the court instructed:

Intent and motive should never be confused. Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted. Personal advancement and financial gain are two well-recognized motives for much of human conduct. These laudable motives may prompt one person to voluntary acts of good, another for voluntary acts of crime. Good motive alone is never a defense where the act done or omitted is a crime. So the motive of the accused is immaterial except insofar as evidence of motive may aid determination of state of mind or intent.

 In *United States v. Lavergne*, 805 F.2d 517 (5th Cir.1986) the trial court gave an instruction defining "intent to defraud" almost identical to that given in the current case. The defendants' good faith was a major defense in the trial. This court stated that "[a] finding of specific intent to deceive categorically excludes a finding of good faith on the part of the appellants." *Id.* at 523. Thus, this court held that because the jury was not prevented from considering the defense of good faith, the omission of a good faith jury instruction did not amount to reversible error. Chenault, who also made good faith his primary defense, therefore would not normally be entitled to a good faith instruction in addition to the intent to defraud instruction.

Chenault also contends, however, that the "motive" instruction undercut the jury's ability to consider his good faith defense. The Supreme Court has said, however, that a good faith instruction is not required by the presence of a motive instruction when the jury is instructed on willfulness. *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 24, 50 L.Ed.2d 12 (1976) (per curiam). Chenault received the same willfulness and motive instructions as

were given in *Pomponio.* Thus, we find no error in these jury instructions.

■ Next, Chenault asserts that the jury should have received specific definitions for "false, forged, altered or counterfeited writing." A trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition. *United States v. Johnson,* 575 F.2d 1347, 1357–58 (5th Cir. 1978). Chenault made no request for such a definition, and thus the instruction is reviewed only for plain error. *United States v. Crockett,* 506 F.2d 759, 762 (5th Cir.1975). Although there are significant distinctions in the specific terms, *United States v. Hagerty,* 561 F.2d 1197, 1199 (5th Cir.1977), they are not clearly terms outside the common understanding of a juror. We thus find no plain error here.

## V

■ Chenault's remaining complaints require only a short discussion. First, Chenault argues that the prosecution as a matter of law failed to prove the charged counts, because each of the progress payment requests that were supported by false documents were later replaced by corrected requests unsupported by any documents. This argument is meritless. The corrected requests were submitted at the request of the government for the purpose of correcting mathematical errors and excluding specific nonreimbursable expenses included in the initial requests. It is irrelevant that the corrected requests rather than the initial requests resulted in the payments to Chenault. It is the defendant's intent, not the success of his actions, that constitutes the crime. *Hyler v. United States,* 402 F.2d 558, 560 (5th Cir.1968); *United States v. Sullivan,* 406 F.2d 180, 187 (2d Cir.1969). For example, in *United States v. Massey,* 629 F.2d 1084 (5th Cir. Unit A 1980), the defendant was convicted of presenting a false bill of sale to obtain money from the Farmers Home Administration even though evidence showed that he did not present the false bill until after the reimbursement check was issued. In affirming the conviction this court stated, "even if Massey presented the F.H.A. with the bill of sale after it issued the check ... he did so with intent to defraud the F.H.A." *Id.* at 1086. Thus, it would not even matter whether the government ever issued payment to Chenault. He committed the crime at the time he presented the false documents with the intent that the government issue payment.

■ Second, Chenault argues that the prosecution failed to prove specific intent. Specific intent is required for conviction under 18 U.S.C. § 495. *Massey,* 629 F.2d at 1086. Specific intent, unlike general intent which means only that a person intend the consequences of his actions, requires that the person have a culpable motive. *See Holloway v. McElroy,* 632 F.2d 605, 618 n. 26 (5th Cir.1980). In this case, specific intent means that the person intended to defraud through his actions.

■ Chenault says that the government proved only general intent and produced no evidence about specific intent. Chenault testified that he was in good faith when he submitted the documents because he was only seeking to get funds to keep his business open to finish the contract and was not trying to defraud the government. However, the use to which he intended to put the funds does not affect the determination that he first intended falsely to obtain them. It is sufficient for us to point out that the jury could reasonably conclude that Chenault went through the long process of obtaining blank invoices, falsely filling them out, and presenting them to the government to obtain money he was not due. Thus, Chenault's arguments on this issue are without merit.

■ Finally, Chenault argues that the prosecution failed to meet its burden of establishing venue. *See United States v. White,* 611 F.2d 531, 536 (5th Cir.1980). The general venue rule for the various false claim and false statement statutes is that venue is proper either where the false statement is prepared and mailed or where it is received. *United States v. Wuagneux,* 683 F.2d 1343, 1356 (11th Cir.1982); 18 U.S.C. § 3237(a). Undisputed evidence

in the record shows that Chenault's business was located in Tupelo, Mississippi, which is within the Northern District of Mississippi. Additionally, the progress payment requests and all of the correspondence between Chenault and the Birmingham contracting office bore the Tupelo address. The pallets inspected by the government were at the Tupelo plant. This evidence, in the absence of any conflicting evidence, is sufficient to prove by a preponderance of the evidence that Chenault prepared and mailed the false documents in Tupelo. Therefore, venue was proper.

### VI

For the reasons set forth in this opinion, the judgment of the district court is AFFIRMED.