**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 94-20611
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEREMIAH JOSEPH LEAHY, IV,
DAVID D. NECE and
SHERRY LYNN FLANAGAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

April 24, 1996

Before JOLLY, DAVIS, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants Jeremiah Joseph Leahy IV, David D. Nece, and Sherry Lynn Flanagan appeal their convictions for various crimes arising out of their involvement in a scheme to defraud the Veterans Administration. Leahy also appeals his sentence. Finding no reversible error, we affirm.

I

Nece owned and operated Great Western Roofing ("GWR") in Houston, Texas. Flanagan was Nece's chief assistant, and Leahy served as bonding agent for GWR. GWR successfully bid on a $1.1

million roofing project for a Veterans Administration ("VA") building in Hines, Illinois. The contract required GWR to obtain surety bonding, and the VA to make progress payments to GWR on a monthly basis, as the work proceeded.[1] The contract gave GWR ninety days to complete the roofing project.

Unbeknownst to the VA, GWR was having financial problems. GWR had filed for Chapter 11 bankruptcy protection just days before receiving the contract on the Hines project. In addition, GWR had a poor record of paying two of its main suppliers, Alphaguard ("AGR") and Railton. Because of GWR's past record, AGR and Railton would not do business with GWR unless GWR set up an escrow account. The escrow agreement required MBank, the escrow agent, to transfer all the funds coming from the VA according to set percentages: forty-five percent to GWR, thirty-seven percent to AGR, and eighteen percent to Railton.

About a month-and-a-half after receiving instructions to begin the project, GWR presented invoices to the VA requesting a progress payment in the amount of $541,385.92, approximately half the contract price. According to testimony at trial, this first request was fraudulent in several respects. The invoice for the bond was false, and GWR had altered two invoices, one from AGR and one from Railton, to make it appear that materials had been

---

[1] The contract was a "fixed-price" contract, which put the risk of overages on GWR))if the work cost more to complete than the estimated bid, GWR would be required to finish the project, and the VA would not be required to pay anything beyond the set contract price.

purchased for the Hines project.  In fact, GWR had not paid for these materials, and they had not been delivered to the job site. Unaware of the fraud, the VA wired $450,972.31 to GWR's escrow account in Houston as payment on this first request.  As per the escrow agreement, MBank transferred $81,175.02 to Railton, $166,859.75 to AGR, and $202,937.54 to GWR's business account.

About ten days after making the first progress payment, the VA became concerned because GWR was falling behind on the project, and the quality of the work being done appeared to be deficient.  The VA sent a "cure notice" to GWR addressing the fact that only eight percent of the project had been completed, as opposed to the estimated twenty-five percent that should have been done by that date.  Two weeks later, GWR sent the VA a request for the second progress payment for $422,163.20.  Comparing this set of invoices with the invoices contained in the request for the first progress payment, the Chief Engineer noticed some striking dissimilarities in the pricing of materials.  After phoning some of the suppliers listed on the invoices, it became clear that the first set of invoices had contained significant misrepresentations. The VA sent a second "cure notice" to GWR noting that it was substantially behind on the project.  Shortly thereafter, GWR walked off the job.

A grand jury indicted Nece and Flanagan for conspiracy to defraud the VA, in violation of 18 U.S.C. § 286 (count one); making and presenting false claims to an agency of the United States, in violation of 18 U.S.C. § 287 (counts two and three); wire fraud, in

violation of 18 U.S.C. § 1343 (count four); and money laundering, in violation of 18 U.S.C. § 1957 (count five). Leahy was indicted on all counts except count three. The defendants were tried before a jury, and found guilty of all charged offenses. All filed timely notices of appeal.

## II

The defendants argue that the district court erred when it removed a juror, Charles Lawrence Orr, on the grounds that his hearing impairment, discovered only after deliberations had begun, made him incompetent to deliberate. The defendants contend that this particular juror was a hold-out on at least some counts. According to the defendants, the other jurors, desiring to end the trial more quickly, conspired to have this juror removed from the group.[2]

The Federal Rules of Criminal Procedure state that "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid jury verdict may be returned by the remaining eleven jurors." FED. R. CRIM. P. 23(b); *United States v. O'Brien*, 898 F.2d 983, 986 (5th Cir. 1990). The district court has the discretion to

---

As evidence of the jury's motive to end the trial quickly, Leahy points to the fact that the foreperson, a doctor, had attempted to have himself removed from the jury because of the death of a patient. According to Leahy, the district court's decision to leave this juror on the panel prejudiced the defendants by causing a "speedy verdict." Leahy, however, voiced no objection at the time and his attorney actually argued that the juror should not be excused. Further, there was no evidence that the foreperson, once the district court denied his request to be excused, failed to effectively carry out his duties or in any way obstructed the proper functioning of the jury. We can find no evidence that the district court's decision to leave this person on the jury prejudiced the defendants in any way.

remove a juror "whenever the judge becomes convinced that the juror's abilities to perform his duties becomes impaired." *United States v. Huntress*, 956 F.2d 1309, 1312 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 2330, 124 L. Ed. 2d 243 (1993) (internal quotation marks omitted). We will not disturb the district court's decision to remove a juror unless it has prejudiced the defendant, and we will only find prejudice if the juror was discharged without factual support or for a legally irrelevant reason. *Id.*

Despite the defendants' suppositions concerning the removal of this juror, the record provides ample support for the district court's decision to dismiss juror Orr. Not only did the juror admit his partial deafness, but all eleven other jurors testified that Juror Orr's hearing impairment precluded meaningful deliberation.[3] Juror Orr apparently refused to discuss the case in deliberations. Testimony indicated that juror Orr had not heard significant amounts of testimony, and could not participate in deliberations because he could not hear, and thus could not follow the conversations in the jury room.[4] The district court's decision

---

Two jurors testified that juror Orr's hearing problem may not have been the sole cause of juror Orr's inability to deliberate, but that perhaps his problem was caused by a combination of his hearing problem coupled with either a desire not to pay attention or an inability to understand the proceedings. Both jurors, however, admitted that hearing was at least part of the problem in the jury room, and all jurors agreed that juror Orr was incompetent to deliberate.

The defendants, citing the foreperson's letter to the court, *see infra* note 6, argue that juror Orr had made up his mind regarding the guilt or innocence of the defendants, and therefore his capacity for deliberation was self-evident. According to the defendants, the attempt to remove juror Orr was only a means to circumvent a holdout juror. Evidence that a juror was holding

to remove juror Orr was further supported by juror Orr's confusion and need for clarification when the judge instructed the jury, except juror Orr, to return to the jury room.[5]  We therefore conclude that juror Orr was not discharged for irrelevant or factually insufficient reasons.[6]  *See United States v. Speer*, 30

out, however, does not alter the trial court's discretion in removing the juror. *Huntress*, 956 F.2d at 1313.  Additionally, the evidence advanced to support juror Orr's status as a holdout is not inconsistent with evidence of his hearing impairment))his refusal to deliberate could have been, as the district court found, the result of his inability to hear, and not his convictions about the case.

         The defendants make much of the fact that the district court failed to discover juror Orr's hearing impairment earlier, either at *voir dire* or during questioning concerning juror Orr's improper conversations with a police officer and a witness during the trial.  While the district court's failure to discover juror Orr's hearing problem earlier provides some support for the position that juror Orr was not hearing impaired, so long as there is sufficient legally relevant factual support for the district court's decision to dismiss, the fact that some evidence points the other way does not merit reversal.  As the district court noted, "there is some testimony in the record that [juror Orr] may lip read."  This would also explain why juror Orr's partial deafness was not discovered prior to deliberations.
     The district court is in the best position to review the juror's competence, "and the scope of the investigation is committed to the district court's sound discretion." *United States v. Coleman*, 997 F.2d 1101, 1106 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 893, 127 L. Ed. 2d 86 (1994). Here the district court conducted a thorough investigation and, based on the testimony of the jurors and the court's own observations, concluded that juror Orr was incompetent to deliberate.  The fact that juror Orr's hearing impairment was not readily apparent is insufficient to call into doubt the district court's decision, based on its observation and evaluation of the jurors in the case, that juror Orr had a hearing problem which created an inability to effectively deliberate.

         The defendants also contend that juror misconduct occurred when the foreman of the jury submitted a note to the district court, typed on a computer and printed on a dot-matrix printer, detailing the jury's consensus belief that juror Orr was incompetent to deliberate.  According to the defendants, this constituted juror misconduct because the note was not written in the presence of the jury, and the foreperson's use of his personal computer to compose the note which was then brought in to the jury constituted outside influence.  The government is correct that the defendants have waived this issue by not raising it below.  As we have previously noted, "a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." *United States v. Wylie*, 919 F.2d 969, 978 (5th Cir. 1990) (citation and internal quotation marks omitted).  Even assuming, *arguendo*, that the defendants had objected below, the defendants have made no "colorable showing" that this note contained any "extrinsic factual matter" which "actually tainted the jury's deliberations." *United States v. Jobe*, No. 94-

F.3d 605, 611 (5th Cir.) (upholding district court's decision to dismiss juror based on "her inability to understand or communicate effectively in English"), *cert. denied*, ___ U.S. ___, 115 S. Ct. 603, 130 L. Ed. 2d 514 (1994); *United States v. Quiroz-Cortez*, 960 F.2d 418, 419 (5th Cir. 1992) (noting that a juror was dismissed after deliberations had begun because the juror "was hard of hearing and may not have heard all of the trial testimony"); *Huntress*, 956 F.2d at 1313 (upholding district court's decision to dismiss mentally ill juror even though juror's mental illness did not appear during voir dire or during the trial); *accord United States v. Acker*, 52 F.3d 509, 515 (4th Cir. 1995) (upholding district court's decision to dismiss juror due to an ankle injury because "[t]he court did not know when this juror was likely to return," and the "remaining jurors were present, ready to resume deliberations, and the alternate jurors had been excused"). Accordingly, we find that juror Orr's dismissal in no way prejudiced the defendants.

### III

The defendants argue that the district court's instructions to the jury constructively amended the indictment. They contend that the instructions regarding the conspiracy allowed the jury to

---

50646, 1996 WL 101744 at *8 (5th Cir. Mar. 8, 1996). The district court established that all jurors agreed with the substance of the letter, and there was nothing factual in the letter which could be characterized as an "outside influence." *See United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984) (distinguishing between "outside influence, such as publicity or direct appeals from third parties," and situations where "jurors themselves have violated an instruction of the court"), *cert. denied*, 471 U.S. 1106, 105 S. Ct. 2340, 85 L. Ed. 2d 855 (1985).

convict them of conspiring with someone other than their co-defendants.[7]    Additionally, the defendants argue that this instruction allowed the jury to convict them for prior frauds against the "United States" rather than for defrauding the Veterans Administration as charged.

A constructive amendment occurs, "when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged."  *United States v. Holley*, 23 F.3d 902, 912 (5th Cir.), *cert. denied*, ___

---

The defendants attribute error to the district court's use of the Fifth Circuit's pattern jury instruction on conspiracy which was read to the jury as follows:

> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt.
>
> First:  That two or more persons made an agreement to defraud the United States;
>
> Second:  That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose;
>
> Third:  That the unlawful purpose of the agreement was to defraud the government through obtaining payment of a false claim.
>
> One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators.  If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him or her for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.
>     . . . .  Similarly, the government need not prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out.  Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

*See* Pattern Jury Instructions, Criminal Cases, U.S. Fifth Circuit District Judges Ass'n, § 2.21 (1990).

U.S. ___, 115 S. Ct. 635, 130 L. Ed. 2d 542 (1994). If an instruction constructively amends the indictment, we must reverse the conviction. *United States v. Restivo*, 8 F.3d 274, 279 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 115 S. Ct. 54, 130 L. Ed. 2d 13 (1994); *United States v. Ylda*, 653 F.2d 912, 914 (5th Cir. Unit A 1981).[8]

Reviewing the charge as a whole, we find that the district court's instructions did not constructively amend the indictment. As to the conspiracy instruction, the defendants argue that the language requiring the jury to find that "two or more persons made an agreement to defraud the government" allowed the jury to convict the defendants for the conduct of "persons" not charged in the indictment. This argument disregards the balance of the instructions, which focused the jury's attention squarely on the conduct of the three charged defendants. Indeed, the language the defendants point to is the only such "general" reference in the instruction. Further, the jury was instructed that the defendants were "not on trial for any act, conduct, or offense not alleged in the indictment" and that the jury should not be concerned with "the guilt of any other person or persons not on trial as a defendant in this case." Finally, the jury received a copy of the indictment

---

The defendants contend that we should apply the standard for constructive amendment found in *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990), *cert. denied*, 499 U.S. 978, 111 S. Ct. 1628, 113 L. Ed. 2d 724 (1991). We decline to do so. *Keller* holds that "an amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *Id*. at 634. As the *Keller* court acknowledges, this standard is not applied in the Fifth Circuit. *Id*. at 633.

for use during deliberations. Based on this record, we hold that the instructions did not constructively amend the indictment on the conspiracy charge. *See United States v. Solomon*, 29 F.3d 961, 965 (5th Cir. 1994) (holding that district court's instruction to jury to convict only for the specific offenses alleged in the indictment coupled with providing the jury with copies of the indictment "resulted in no uncertainty about whether the jury convicted Solomon of an offense not charged in the indictment"), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1115, 130 L. Ed. 2d 1079 (1995); *Holley*, 23 F.3d at 912 (finding no constructive amendment of the indictment because "the district court instructed the jury that it was to consider only the crime that was charged in the indictment" and "the indictment was read to the jury at the beginning of the trial, and the jury was given a copy of the indictment for use during the deliberations").

For similar reasons, we find that the district court did not constructively amend the indictment through its single, isolated use of the term "United States" in the jury instruction.[9] Reading the instruction as a whole, the district court properly focused the jury on the defendants' conduct vis-a-vis the VA, the fraud charged in the indictment. Although the district court admitted evidence under FED. R. EVID. 404(b), concerning other conduct in which the

---

The defendants find fault with the district court's statement that the government had to prove, among other things, that "two or more persons made an agreement to defraud the United States." The use of the term "United States," the defendants argue, allowed the jury to convict the defendants on evidence that the defendants defrauded agencies of the United States other than the V.A., the only fraud charged in the indictment.

-10-

defendants may have defrauded other agencies of the United States government, *see infra* Part VIII, the district court took great pains to limit the jury's consideration of that evidence. As we have previously stated, "We see no reason to assume that the jurors disregarded the court's charge and based their verdict on conduct that was not charged in the indictment." *Holley*, 23 F.3d at 912. Accordingly, we hold that the district court did not constructively amend the indictment in its instructions to the jury.[10]

### IV

The defendants next argue that the government used perjured testimony during the trial. They argue that the government knowingly allowed Ray Harvey, a government witness and former associate of GWR, to lie on the witness stand to obtain the defendants' convictions. In order to establish that the government improperly used false testimony, the defendants must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution had knowledge that the witness's testimony was false. *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995). We will reverse a conviction obtained through the use of perjured testimony. *United States v. Blackburn*, 9 F.3d 353,

---

Leahy argues further that the district court erred (1) in its instruction to the jury concerning the dismissal of juror Orr, and (2) in directing the jury to re-read the instruction given, in response to the jury's request to clarify the meaning of "intent" in the conspiracy charge. Leahy, however, failed to object to either instruction. The district court's instructions were both clear and accurate statements of the law as it pertained to the case, and we see no possibility that the jury misinterpreted them. *See United States v. Lara-Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990) (setting forth standard for reviewing jury instructions). Leahy has failed to show that any error occurred, plain or otherwise.

357 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 115 S. Ct. 102, 130 L. Ed. 2d 51 (1994).

Ray Harvey testified, in pertinent part, that submitting invoices as paid when they had not been paid is "not an acceptable practice." When asked, "Do you do it with your company?" Ray Harvey replied, "No I do not." According to the defendants this was a "lie" when compared with Harvey's statements to government investigators that he had submitted false invoices on behalf of GWR on several occasions. This argument is wholly without merit. Just prior to the exchange at issue, Harvey testified that he now has his own roofing company, and the reference to "your company" is thus a reference to Harvey's current interest, not GWR. When Harvey stated that he does not submit false invoices, he was testifying to the fact that he does not *now* submit false invoices, not that he never submitted false invoices. Harvey's reply makes no reference whatsoever to past actions. Accordingly, this statement cannot form the basis for a claim that the government knowingly used perjured testimony because Harvey's statement was not actually false. *Blackburn*, 9 F.3d at 357.

V

Leahy argues that the government failed to establish venue in the Southern District of Texas for the false claims offense charged in count two of the indictment. According to Leahy, venue was only proper in the Northern District of Illinois, where the claim was presented to the VA. The government carries the burden of

establishing venue, and must do so by a preponderance of the evidence. *United States v. Fells*, No. 95-10296, 1996 WL 99754, (5th Cir., March 7, 1996); *United States v. White*, 611 F.2d 531, 536 (5th Cir.), *cert. denied*, 446 U.S. 992, 100 S. Ct. 2978, 64 L. Ed. 2d 849 (1980).

In general, venue under the "various false claim and false statement statutes" is proper "either where the false statement is prepared and mailed or where it is received." *United States v. Chenault*, 844 F.2d 1124, 1131 (5th Cir. 1988). We see no reason to deviate from this rule in this case. By criminalizing the making or presenting of false claims, the language of § 287 is in accord with the general venue rule for false claim crimes. *See United States v. Blecker*, 657 F.2d 629, 632 (4th Cir. 1981) (interpreting § 287 to mean that "venue lies to prosecute a violator of this statute in either the district in which the claims were made or prepared . . . or the one in which they were presented"), *cert. denied*, 454 U.S. 1150, 102 S. Ct. 1016, 71 L. Ed. 2d 304 (1982). The government established by a preponderance of the evidence that GWR prepared the false invoices in Houston, and GWR received the progress payment in Houston. Because Houston lies within the Southern District of Texas, venue was proper within that district. *See Chenault*, 844 F.2d at 1132 (finding preponderance of evidence to show venue because Chenault's business was located within district and progress payments were sent to that location).

VI

Leahy next argues that the government failed to present sufficient evidence to support his conviction for conspiracy, making false claims, wire fraud, and money laundering. When a defendant challenges his conviction for sufficiency of the evidence, we must determine "whether, after viewing the evidence and all inferences that may reasonably be drawn from it in the light most favorable to the prosecution, any reasonably-minded jury could have found that the defendant was guilty beyond a reasonable doubt." *United States v. Triplett*, 922 F.2d 1174, 1177 (5th Cir.), *cert. denied*, 500 U.S. 945, 111 S. Ct. 2245, 114 L. Ed. 2d 486 (1991). The evidence need not rule out every reasonable hypothesis of innocence or be entirely inconsistent with every conclusion except guilt. *Id*. So long as a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, the conviction will stand. *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991).

A

Leahy argues that the government presented insufficient evidence to support his conviction under count one, conspiracy to submit false claims in violation of 18 U.S.C. § 286. To obtain a conviction for conspiracy to defraud the United States under § 286, the government must prove beyond a reasonable doubt that the defendant entered into a conspiracy to obtain payment or allowance of a claim against a department or agency of the United States; that the claim was false, fictitious, or fraudulent; and that the

-14-

defendant knew at the time that the claim was false, fictitious, or fraudulent.[11]  *See United States v. Lanier*, 920 F.2d 887, 892 (11th Cir.) (discussing the elements of § 286), *cert. denied*, 502 U.S. 872, 112 S. Ct. 208, 116 L. Ed. 2d 166 (1991).  Once the government has established an illegal conspiracy, "it need only introduce `slight evidence' to connect an individual defendant to the common scheme."  *United States v. Duncan*, 919 F.2d 981, 991 (5th Cir. 1990), *cert. denied*, 500 U.S. 926, 111 S. Ct. 2036, 114 L. Ed. 2d 121 (1991).

Reviewing the record in the light most favorable to the jury verdict, we find ample evidence to support the existence of, and Leahy's participation in, a conspiracy to defraud the VA. Testimony at trial indicated that Leahy arranged for false sureties to help GWR obtain the VA roofing contract.  The evidence showed that Leahy had knowledge that the sureties submitted on the VA job were false:  one surety was fictitious, and the other refused to honor his agreement with GWR because it was obtained through "fraud

---

Leahy argues that his convictions under counts one and two, for violations of 18 U.S.C. §§ 286 and 287 respectively, were in error because in fact no "false claim" was submitted to the VA.  According to Leahy, because the contract was a fixed price agreement, the amounts and accuracy of invoices sent to the VA are not relevant, and cannot support convictions for submitting false claims.  In essence, Leahy argues that since the VA must pay the contractor $1.1 million, regardless of what the invoices total, no false claim was actually made. We disagree with Leahy's interpretation of §§ 286 and 287.  These statutes prohibit the making of "false, fictitious, or fraudulent claim[s]" for the purpose of defrauding the United States.  18 U.S.C. §§ 286, 287.  Testimony at trial indicated that the invoices sent to the VA were "false" in many respects))items were stamped "paid" when they had not been paid for, prices had been altered and inflated, and materials were represented as delivered to the job site when in fact they had not been delivered.  These claims certainly fall within the statutes' prohibition.  It is irrelevant that the total amount that the VA could have been defrauded was capped at $1.1 million by the contract.

-15-

and misrepresentation."  Leahy admitted that he "possibly" prepared the false $55,000 invoice which GWR sent to the VA, and testimony pointed to Leahy as the party who directed a subordinate to sign the invoice "paid" when it had not been paid.  Further, it is undisputed that GWR subsequently paid Leahy $14,300 for his work on obtaining sureties for the Hines project.  From this evidence the jury could have inferred that this payment constituted Leahy's agreed to "cut" of the fraudulent proceeds.  Leahy also worked out of GWR's offices, and represented himself to the VA as the "controller" of GWR, providing further evidence of his connection with GWR's scheme to defraud.[12]  Judging from the record, we conclude that a rational trier of fact could have found that Leahy knowingly participated in the conspiracy to defraud the VA.[13]

B

Leahy claims that the government presented insufficient evidence to support his conviction for wire fraud, in violation of 18 U.S.C. § 1343.  In order to establish wire fraud, the government must prove that a defendant knowingly participated in a scheme to defraud, and that interstate wire communications were used to further the scheme.  *United States v. St. Gelais*, 952 F.2d 90, 95

---

Although Leahy's testimony contradicted some of the other evidence presented to the jury, that fact alone will not call the verdict into question. We review the totality of the evidence presented, and recognize that the jury is free to discount or credit the testimony as it sees fit.

Leahy also argues that the government presented insufficient evidence to support his conviction for count two))aiding and abetting in "making or presenting a false claim" to the United States under 18 U.S.C. § 287.  Reviewing the record as a whole, and in light of the facts articulated above, we find sufficient evidence to support Leahy's conviction on this count.

(5th Cir.), *cert. denied*, 506 U.S. 965, 113 S. Ct. 439, 121 L. Ed. 2d 358 (1992). In addition, beyond intent to defraud, the government must show that the defendants intended that some harm result from the fraud. *Id*. Intent to defraud for the purpose of personal gain will satisfy the "harm" requirement of the wire fraud statute. *Id*.

The evidence established that Leahy, Flanagan, and Nece devised a scheme to defraud the VA. Their intent was to obtain as much of the contract price as possible for their own personal gain. To achieve the goals of the scheme, the defendants submitted fraudulent invoices to the VA and, in accordance with GWR's wishes, the VA wired $450,972.31 to the MBank account in Houston. Of these funds, GWR ultimately received over $200,000, and Leahy personally received $14,300. As in any conspiracy, it is sufficient that Leahy knowingly joined the conspiracy in which wire fraud was a foreseeable act in furtherance of the conspiracy. *See United States v. Basey*, 816 F.2d 980, 997 (5th Cir. 1987) (holding that once a defendant's knowing participation in a conspiracy has been established, "the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners"). Based upon the record in this case, we conclude that a rational jury could have found that Leahy, either personally or through the foreseeable acts of his co-conspirators, engaged in wire fraud.

C

-17-

Leahy argues that the government presented insufficient evidence to support his conviction for money laundering, under 18 U.S.C. § 1957. According to Leahy, the transfer of funds from the escrow account into GWR's primary business account))the transaction for which the defendants were convicted under § 1957))did not involve "criminally derived property." To obtain a conviction under § 1957, the government must prove that the defendant knowingly engaged, or attempted to engage, in a monetary transaction involving criminally derived property, in excess of $10,000, derived from specified criminal activity. 18 U.S.C. § 1957(a). The statute defines "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B)" 18 U.S.C. § 1957(f)(1). The statute requires that the monetary transaction involve money "derived from" or "obtained from" a criminal offense. *See* 18 U.S.C. § 1957(f)(2) (defining "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense"). Thus, in order for a defendant to violate this statute, the funds in question must already be "proceeds obtained from a criminal offense" when the defendant transfers them. *See United States v. Johnson*, 971 F.2d 562, 568-69 (10th Cir. 1992) (examining plain language and legislative history of § 1957 and holding that

proceeds must be criminally obtained prior to the transaction that forms the basis for the § 1957 money laundering conviction); *United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir.) (reversing § 1957 conviction on the grounds that the funds were not criminally obtained because they "never came into the possession or under the control of the conspirators"), *cert. denied*, ___ U.S. ___, 115 S. Ct. 267, 130 L. Ed. 2d 185 (1994); *Cf. United States v. Gaytan*, 74 F.3d 545, 555-56 (5th Cir. 1996) (applying 18 U.S.C. § 1956, and holding that "a transaction to pay for illegal drugs is not money laundering, because the funds involved are not proceeds of an unlawful activity when the transaction occurs, but become so only after the transaction is complete").

Relying on *Johnson* and *Piervinanzi*, Leahy argues that the money obtained from the VA was not "proceeds obtained from a criminal offense" until the escrow agent, MBank, transferred the money into GWR's primary business account. GWR had set up an escrow account to receive the proceeds of the VA contract, and the escrow agreement gave MBank instructions on how to distribute the funds))forty-five percent to GWR's business account, thirty-seven percent to AGR, and eighteen percent to Railton. In light of this arrangement, Leahy contends that GWR did not *possess* the funds sent from the VA until they were deposited in GWR's business account. Thus, Leahy argues, the wire fraud was not complete until the funds arrived in GWR's business account, and therefore MBank's transfer of funds to GWR's business account did not involve criminally

-19-

derived proceeds, in violation of § 1957. We disagree. Fraudulent schemes produce proceeds, "at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the *control* of the perpetrators." *United States v. Allen*, No. 94-20403, 1996 WL 82627 at *12 (5th Cir., Feb. 27, 1996) (emphasis added); *see also Piervinanzi*, 23 F.3d at 677 (stating that either possession of or "control" over funds would cause a subsequent transfer to violate § 1957). Control is established once money is placed into a perpetrator's account. *Allen*, 1996 WL 82627 at *11. Thus, we must determine, for the purposes of § 1957, whether the escrow account was functionally GWR's account under the facts of this case.

GWR created the escrow account into which the VA was to send all payments on the contract. Pursuant to the contract, GWR had a right to receive the entire payment sent from the VA.[14] GWR assigned its rights to receive these payments to the escrow account, and, through the escrow agreement, directed MBank's distribution of the funds. GWR's assignment to the escrow account and directive to the escrow agent *caused* the funds to be sent to the escrow account, and then to be distributed, as per GWR's directive, forty-five percent to GWR, thirty-seven percent to AGR, and eighteen percent to Railton. MBank had no discretion as to how these funds were distributed. Judging from this record, we find

---

GWR set up the escrow arrangement to facilitate deals with AGR and Railton, suppliers from which GWR obtained invoices used to further its scheme to defraud.

that GWR had sufficient control over the escrow account so that the wire fraud was complete when the money was deposited into the escrow account. Thus, the subsequent transfers, directed by GWR through the escrow agreement, involved illegally obtained proceeds. GWR set up this circuitous set of transfers, and for purposes of § 1957, we find it irrelevant that GWR chose to have a third party, devoid of discretion over the funds, receive and distribute the proceeds of GWR's fraudulent venture.[15] Accordingly, we find sufficient evidence to support Leahy's conviction for money laundering under § 1957. The transfer from the escrow account to GWR's business account involved "proceeds obtained from a criminal offense," and therefore provided a legally sufficient predicate for the § 1957 conviction. *See United States v. Savage*, 67 F.3d 1435, 1443 (9th Cir. 1995) (upholding § 1957 conviction even though funds had not gone to defendant's account because the "funds were clearly at Savage's disposal at the time of deposit))the record indicates that the parties named on the accounts transferred the money at his request"), *cert. denied*, ___ U.S. ___, 116 S. Ct. 964, ___ L. Ed. 2d ___ (1996); *United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995) (upholding § 1957 conviction of conspirator because, although

---

We note that, on these facts, GWR could be held to have been in constructive possession of the funds in the escrow account. *See United States v. DeLeon*, 641 F.2d 330, 335 (5th Cir. Unit A Apr. 1981) (noting that "[c]onstructive possession need not be exclusive," and holding that "`[c]onstructive possession is the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance'"); *United States v. Poole*, 929 F.2d 1476, 1483 (10th Cir. 1991) (explaining that constructive possession need not be exclusive, but rather, "requires that the individual knowingly hold the power and ability to exercise dominion and control over the property").

he did not personally transfer the funds, his participation meant that "he was . . . in constructive possession and control of the fraudulently procured funds at the time those funds were transferred in violation of § 1957"), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1970, 131 L. Ed. 2d 859 (1995).[16]

VII

Leahy argues that the district court erred in admitting evidence of other fraudulent acts under FED. R. EVID. 404(b). The evidence complained of was (1) that Nece had submitted false invoices on a roofing project at the Jacksonville Naval Air Station; and (2) that GWR submitted false invoices on a roofing project for Tinker Air Force Base. Extrinsic offense evidence is properly admitted under Rule 404(b) only if: (1) it is relevant to an issue other than the defendant's character, and (2) its probative value is not substantially outweighed by its undue prejudice. FED. R. EVID. 403, 404(b); *United States v. Ponce*, 8 F.3d 989, 993 (5th Cir. 1993); *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472 (1979). Evidence is relevant "if it makes the existence of any fact at issue more or less probable than it would be without the evidence." *United States v. Williams*, 900 F.2d 823, 826 (5th Cir. 1990). We review a district court's decision to admit extrinsic evidence for abuse of discretion.

---

Leahy's remaining arguments relating to the sufficiency of the evidence are wholly without merit.

*United States v. Sanchez*, 988 F.2d 1384, 1393 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 217, 126 L. Ed. 2d 173 (1993).

Having reviewed the record, we cannot say the district court abused its discretion in admitting the extrinsic evidence. The evidence was relevant to an issue other than character. The evidence tended to show that the defendants had the requisite intent to defraud the VA, and were not innocently mistaken as to the effect of their conduct. *See id*. (holding that "because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense"). The district court's finding of relevance was further supported by the fact that the conduct at issue in this case and the conduct allegedly committed on the two other contracts was virtually identical.[17] *See Beechum*, 582 F.2d at 911 (holding that "relevance [of extrinsic evidence] is a function of its similarity to the offense charged").

We also find that the district court properly determined that the evidence's probative value was not substantially outweighed by its potential prejudicial effect, as required under FED. R. EVID. 403. While some danger of prejudice is always present, exclusion of extrinsic evidence based on its prejudicial effect "should occur

---

The evidence concerning the Jacksonville contract showed that Nece submitted false invoices concerning a roofing contract. This evidence was not admitted against Leahy, and the district court properly instructed the jury not to consider it against him. The Tinker evidence showed that GWR had submitted false invoices, and further disclosed that Leahy had obtained sureties, which he caused to be certified "sufficient," when in fact he had not verified their assets.

only sparingly." *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 2180, 128 L. Ed. 2d 899 (1994). After reviewing the record in this case, we cannot say that this evidence rises to the level of "undue prejudice" necessary to block its admission. *See United States v. McRae*, 593 F.2d 700, 707 (5th Cir.) (noting that Rule 403's major function is only to exclude matters of slight probative force, "dragged in by the heels for the sake of prejudicial effect"), *cert. denied*, 444 U.S. 862, 100 S. Ct. 128, 62 L. Ed. 2d 83 (1979). Further, the district court thoroughly instructed the jury concerning the limited use of the extrinsic evidence, thereby minimizing its possible prejudicial effect. *See Buchanan*, 70 F.3d at 832 (holding that careful jury instruction "substantially reduced the possibility of prejudice"). *United States v. Henthorn*, 815 F.2d 304, 308 (5th Cir. 1987) (finding that careful jury instruction "minimized the possibility of prejudice"); *United States v. Gordon*, 780 F.2d 1165, 1174 (5th Cir. 1986) (holding that "improper admission of [extrinsic] evidence may be cured by appropriate limiting instructions"); *see also United States v. West*, 22 F.3d 586, 593 (5th Cir.) (citing *Zafiro v. United States*, ___ U.S. ___, ___, 113 S. Ct. 933, 939, 122 L. Ed. 2d 317 (1993) for the proposition that "juries are presumed to follow their instructions"), *cert. denied*, ___ U.S. ___, 115 S. Ct. 584, 130 L. Ed. 2d 498 (1994). We hold that the district court did not abuse its discretion in admitting the Jacksonville and Tinker evidence.

VIII

Leahy contends that the district court erred in calculating the amount of money laundered under § 2S1.2 of the Sentencing Guidelines, which resulted in a two-level increase in Leahy's offense level. *See* U.S.S.G. §§ 2S1.2(b)(2) (referencing § 2S1.1(b)(2) which allows for a two-level increase in offense level if the value of the funds laundered exceeds "[m]ore than $200,000"). According to Leahy, the district court should not have used the $202,937.54 figure, the amount transferred to GWR's business account from the first payment on the VA contract. Leahy argues instead that in determining the value of the funds laundered, it is necessary to offset the total amount GWR received from the VA with the expenses GWR incurred in pursuant to the roofing contract.

We will uphold a sentence under the Sentencing Guidelines "unless a defendant can demonstrate that it was imposed in violation of the law, was imposed because of an incorrect application of the guidelines, or was outside the range of applicable guidelines and is unreasonable." *United States v. Castenda-Cantu*, 20 F.3d 1325, 1335 (5th Cir. 1994). Normally, we review the district court's valuation of funds for clear error. *United States v. McCaskey*, 9 F.3d 368, 372 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1565, 128 L. Ed. 2d 211 (1994). Here, however, Leahy failed to object to the district court's calculations, and therefore we review for plain error. *United*

*States v. Lopez*, 923 F.2d 47, 49 (5th Cir.), *cert. denied*, 500 U.S. 924, 111 S. Ct. 2032, 114 L. Ed. 2d 117 (1991).  A finding of plain error empowers the court, in its discretion, to correct the mistake.  The reviewing court may do so only if the error seriously affected the "fairness, integrity, or public reputation" of the judicial proceedings.  *United States v. Calverley*, 37 F.3d 160, 164 (5th Cir. 1994) (en banc), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1266, 131 L. Ed. 2d 145 (1995).

The district court's decision to sentence Leahy based on the entire amount of the transfer to GWR's business account was not erroneous.  When calculating funds for sentencing purposes, it is permissible to consider the entire amount the parties *intended* to launder.  *United States v. Tansley*, 986 F.2d 880, 884 (5th Cir. 1993).  The record provides sufficient support for the finding that the defendants intended to launder the full $202,937.54 sent by the VA, and that the parties did in fact receive that amount.  In addition, there was evidence at trial that GWR intended to obtain as much of the $1.1 million contract price as possible.  We conclude that the district court did not commit plain error in sentencing Leahy for the $202,937.54 payment.[18]

---

Leahy also argues that the district court erred in not granting him a downward departure from the guidelines because the district court sentenced him under the guideline relating to money laundering, as opposed to the guideline applicable to fraud.  According to Leahy, the "heartland" of the crime committed was fraud, and not money laundering.  Leahy relies on the introduction to the guidelines which states,

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct

Finally, Leahy argues that the district court erred at sentencing in finding that the total loss to the VA, under U.S.S.G. § 2F1.1, was over $500,000. We review the district court's determination of loss under § 2F1.1 for clear error. *United States v. Brown*, 7 F.3d 1155, 1159 (5th Cir. 1993). These findings are entitled to "substantial deference" on appeal. *United States v. Gaddison*, 8 F.3d 186, 193 (5th Cir. 1993). A factual finding is not clearly erroneous if it is "plausible in light of the record read as a whole." *United States v. Shipley*, 963 F.2d 56, 59 (5th Cir.), *cert. denied*, 506 U.S. 925, 113 S. Ct. 348, 121 L. Ed. 2d 263 (1992).

Reviewing the record as a whole, we find that there was ample support for the district court's finding of loss under § 2F1.1. There is nothing in Leahy's objections at sentencing which would call into question the presentence report's factual determination, adopted by the district court, that the VA suffered losses totalling $523,631.38. The number was calculated using the amount GWR overcharged the VA ($199,331.38), the amount of the false bond

significantly differs from the norm, the court may consider whether a departure is warranted.
U.S.S.G., Ch. 1, Pt. A, § 4(b).

Leahy does not argue that the district court misapplied the guidelines. Rather, Leahy believes that the district court failed to properly exercise its discretion to depart. At trial, however, Leahy did not request a departure on this ground, nor did he object to the district court's implicit decision not to depart. As we have previously held, outside misapplication of the guidelines, a "district court's decision not to depart is unreviewable on appeal." *United States v. Buchanan*, 70 F.3d 818, 828 n.9 (5th Cir. 1996) (citing *United States v. Leonard*, 61 F.3d 1181, 1185 (5th Cir. 1995)).

premiums ($55,000), the amount of additional materials the VA had to purchase to complete the project ($220,000) and the amount of physical damage caused by GWR ($96,000).[19]  Additionally, because these losses resulted directly from the defendants' scheme to defraud, they were properly attributed to the defendants.  *See* U.S.S.G. § 2F1.1, comment. (n.7(c)) (allowing consequential damages in cases dealing with "procurement fraud"); *United States v. Stouffer*, 986 F.2d 916, 928-29 (5th Cir. 1993) (upholding district court's decision to attribute all losses to the defendants which were "caused by the scheme to defraud").  The district court's finding of loss is plausible in light of the record, and we therefore uphold the district court's determination.[20]

X

We find the remainder of the defendants' claims to be without merit.  Accordingly, we AFFIRM the convictions of Jeremiah Joseph Leahy IV, David D. Nece, and Sherry Lynn Flanagan, and we AFFIRM

---

The district court accepted Leahy's objection as to $40,700 which GWR ultimately paid pursuant to obtaining surety bonds, and reduced the total amount of the VA's loss for sentencing purposes from $564,331.38 to $523,631.38.

We note that even if we were to find fault with the district court's calculation of loss, it would make no difference to the sentences imposed in this case.  Under grouping principles, the defendants were sentenced for the money laundering charge under U.S.S.G. § 2S1.1.  *See* U.S.S.G. § 3D1.3 (directing district court to sentence under the most serious count in the group).  Section 2S1.1 determines offense levels by the amount of money laundered, in this case $202,937.54, not the amount of loss suffered by the victim of the fraud.  *See* U.S.S.G. § 2S1.1.  Because the defendants were sentenced under § 2S1.1, and not § 2F1.1, the amount of loss suffered by the VA played no part in the offense level calculation made by the district court.  In addition, the district court ordered no restitution in this case.  Because we affirm the defendants' convictions for money laundering, and the district court's calculation of the value of the funds laundered, a finding that the district court miscalculated the amount of loss the VA suffered under § 2F1.1 would not change the defendants' sentences.

Leahy's sentence.