UNITED STATES of America

v.

**Mordechai SAMET and Chaim Hollender, Defendants.**

**No. 01 CR. 216(CM).**

United States District Court, S.D. New York.

June 26, 2002.

---

James P. Cinque, Cinque & Cinque, P.C., New York City, Samuel I. Burstyn, Miami, FL, for Mordechai Samet.

Cynthia Keefe Dunne, U.S. Atty's Office, White Plains, NY, Maria A. Barton, Margery B. Feinzig, Mary Jo White, U.S. Atty., New York City, for U.S.

## DECISION GRANTING DEFENDANTS' MOTIONS FOR MISTRIAL AND DENYING GOVERNMENT'S MOTION FOR RULE 23(B) DISCHARGE OF JUROR

McMAHON, District Judge.

Fed.R.Crim.P. 23(b) permits a Court to discharge a deliberating juror for just cause when the juror becomes unable to perform her duties as a juror by reason of illness or incapacity—a term that has been broadly defined to include psychological inability to go forward with deliberations. *United States v. Thomas*, 116 F.3d 606 (2d Cir.1997), prohibits a Court from discharging a deliberating juror if the record evidence reveals any possibility that the request to discharge the juror stems from her views of the merits of the case. The question raised by the instant motions is: what to do when the reason a deliberating juror can no longer perform her duty is due to the pressures of being in the minority? Put otherwise, when Rule 23(b) intersects with *Thomas*, which yields?

This case involves a seventy-three count indictment that was originally brought against fourteen defendants, all of whom are members of the Hasidic Jewish community, most of whom live in or near the Village of Kiryas Joel. It charges the defendants with a variety of frauds (mail, wire and bank) involving Ponzi schemes, phony bank deposits, insurance policies issued in false names, and hundreds of dummy tax filings claiming earned income credits. The principal defendants (including the two defendants who are on trial) are additionally charged with violating the Racketeering Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961, by their participation in what the Government characterizes as "The Samet Group."

The case took seven weeks to try. Jury selection was done using questionnaires, given the length of the trial, the nature of the issues, and the notoriety of the community.[1] After reviewing 272 questionnaires, and conducting individual voir dire of over 120 venire persons, a total of 12 jurors and 6 alternates were empanelled. Presentation of evidence, summations and the charge took another six weeks. The jury commenced deliberations on June 10, 2002, at about 3:30 P.M.

The jury deliberated without incident through Thursday, June 13. It sent out

---

1. Kiryas Joel often finds itself in the news. It has, of course, been engaged for over a decade in a series of celebrated (and heretofore unsuccessful) legislative efforts to carve itself out of the Monroe–Woodbury School District as its own separate school district—efforts that have resulted in no fewer than four United States Supreme Court opinions. *Board of Educ. v. Grumet*, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994); *Attorney General v. Grumet*, 510 U.S. 1107, 114 S.Ct. 1046, 127 L.Ed.2d 369 (1994); *Board of Educ. v. Grumet*, 510 U.S. 989, 114 S.Ct. 544, 126 L.Ed.2d 446 (1993); *Board of Educ. v. Grumet*, 509 U.S. 938, 114 S.Ct. 10, 125 L.Ed.2d 762 (1993). Its disputes with other Hasidic communities are fodder for New York's tabloid newspapers. See, for example, Susan Edelman, "Satmar Sibling Rivalry Hurting Them All," *New York Post*, Mar. 10, 2002. The largesse received by the Village from the State's coffers is the source of considerable discontent in Orange County. Chris McKenna, "Kiryas Joel's Deep Pockets," *Middletown Times Herald–Record*, May 12, 2002. Not surprisingly, a significant number of jurors were disqualified during voir dire after expressing strong opinions about the Village, its residents and its political contacts.

very few notes, but those that came indicated that the jurors were intimately familiar with the evidence, notwithstanding the length and complexity of the trial, and were focused on the task at hand. There was not the slightest evidence of any discord.

The world view in the courtroom changed radically on the morning of Friday, June 14, which would have been the fifth day of deliberations. At 8:45 A.M., Robert Rogers, the Deputy Chief Clerk of the Court for the White Plains Division delivered the news that Juror # 2 had called, announced that she could not deliberate any more and planned not to come to Court. He had directed her to report at 9:45 A.M. Shortly thereafter, when my senior law clerk (who functions as my Deputy Clerk in criminal cases) arrived, he found three messages from Juror # 2 on his phone mail. Two had been left the previous evening; the third a few moments earlier. All were in a semi-hysterical tone of voice—teary, anxious, fearful.

The first message was: "Hi, Jim. This is [Juror # 2]. Could you please get one of the alternates to replace me? I'm being verbally abused. And the way I feel right now, for me to run out, I'm just going to vote the same as everyone else, just to be done with this. I can't sleep. I've been living on kaopectate since the trial started. My nerves just can't take it anymore. Please call me. The number is [xxx-xxx-xxxx]. The cell phone number's [xxx-xxx-xxxx]. Thank you. And please, if I have to, if I can't get out of this, please don't mention this to the jury members, because that's just going to make it worse. Please. Thank you. Bye."

The second message said: "Hi, Jim. It's [Juror # 2] again. I just want to let you know I don't plan on coming tomorrow morning. I'm physically sick to my stomach. I no longer feel that I can be fair.

Please call me as soon as you can at home. The number is [xxx-xxx-xxxx]. Thank you."

And the third message said: "Jim, hi. It's [Juror # 2] again. It's a quarter to 9:00. I'm still trying to reach you. I spoke to Robert Rogers. He told me that I need to come in. I'm sick to my stomach. But if you get this message, maybe you can try to call me in the car. I'm going to try to make my way in. I'm obviously going to be very late. The cell phone number is [xxx-xxx-xxxx]. I just—there's no point in me being on this trial anymore, because I feel like I can no longer be fair. I don't feel like I can voice an opinion. If I have any questions, I just—I got to get out. I can't handle it anymore. Thank you."

As soon as counsel and the defendants had gathered, the messages were played for them. The Government, noting the distress in Juror # 2's voice, suggested that a careful and limited inquiry be conducted in order to determine whether she was capable of deliberation. If she was not, the Government asked that the deliberation proceed with eleven jurors. Defendant Samet's counsel argued that Juror # 2 should only be removed from the jury if it is absolutely necessary and that empanelling an alternate juror should not be considered. Both defendant Samet's counsel and defendant Hollender's counsel suggested that it might be advisable to let the jury leave early and reconvene on Monday, in order to allow for a cooling-off period. (6/14/02 Tr. at 3569–3578).

The Court had previously arranged to segregate Juror # 2 from her fellow jurors upon her arrival. After consultations with counsel were concluded, I voir dired her in the presence of counsel and the defendants.

The first voir dire went as follows:

THE COURT: Hi, [Juror # 2]. I'm going to ask you to speak up. Okay? We've all heard the messages that you left for Jim. Thanks for leaving them. As a result, I was able to play them for everybody. And we also got the note that Robert Rogers sent up after he spoke to you on the telephone. And I am so sorry, and we're all very sorry, that you are feeling so poorly and so upset. I need to ask you some questions. Okay? I have to caution you about some things. You remember, when I instructed the whole jury I don't want to know what's going on in the deliberations? I need to reinforce that. It's very important that we're not supposed to invade that jury room. So it's very important that you not tell me about what is the nature of the deliberations or what the vote is, or anything else like that. But I want to ask you about, not about counts and votes and stuff like that, but about how you feel you're being treated and how it's affecting your ability to proceed as a deliberating juror. That's what the issue is. So I gather that you're feeling a little abused.

JUROR # 2: By just one.

THE COURT: By just one person?

JUROR # 2: Yes. Everybody is being nice. It's hard for me to say without—

THE COURT: I hate to do this. But could we put you in the witness box, just so you'll have the microphone.

JUROR # 2: I'm just not sure how to answer without saying what's going on in there.

THE COURT: I understand. It's tricky. It's tricky. You say there is one person who is being abusive to you.

JUROR # 2: Yes. I just don't feel that I can voice my opinions, or if I have a question or a doubt, if I want to vote one way or the other, everyone is upset, because I just don't—oh, how do I say this? I just feel like I'm open-minded.

THE COURT: I want everyone to be open-minded.

JUROR # 2: I don't believe that's the case. Well, I can't say that.

THE COURT: This is the time of the case when people actually do form opinions. So it's not open-minded in the same sense of being open-minded during the trial. People are deliberating, people are, in fact—

MR. BURSTYN: You're Honor, I believe you're doing—

THE COURT: Mr. Burstyn, okay. But what I'm trying to figure out is whether I've got—without the details of what people are talking about, whether I've just got folks who are tired and testy because this has been going on for several days, or whether you're being treated wrongfully. I mean, there's a difference between those two things.

JUROR # 2: I think everyone is focused in one direction, one direction only.

THE COURT: Okay.

JUROR # 2: In—

THE COURT: Okay. Let me ask you a couple of other questions. On the telephone, you indicated that you were really upset, that you were on kaopectate.

JUROR # 2: Yes, I'm sick every day. My nerves, the stress. It's just—I don't feel I can be fair anymore. I'd just vote as everyone else is.

THE COURT: That's a big question. That's a big question. Obviously, if I were to instruct you as the Judge that we've resumed deliberations, maybe

today, maybe Monday, to give people a chance to cool off a little bit, and that everybody is supposed to go in and do their best and be fair deliberating jurors, would you be able to follow that instruction?

JUROR # 2: I think I may be the only one who follows the instruction.

THE COURT: Do you think it would help to kind of cool things off if we sent everybody home and started again on Monday?

JUROR # 2: I don't want to be here anymore. I really don't.

THE COURT: I know—

JUROR # 2: I know that, but I don't feel that we're ever going to come to any conclusion based on the way everyone is focusing to the point. See, I can't even say what's going on. It's just so farfetched.

THE COURT: If we were to bring the others out here—I don't know whether today or Monday—and I were to remind them to respect everybody's views, would that make it easier for you to go on?

JUROR # 2: I don't think so. We can't bring an alternate in?

THE COURT: I get—

JUROR # 2: You ask the questions, I know. I've sat here long enough to know.

THE COURT: I wish we could have like a normal, human conversation. And of course, in these circumstances, we can't have a normal, human conversation, and I apologize for that. Let me ask you a question. What do you mean when you say you don't think you can be fair anymore?

JUROR # 2: I think I'm just going to start going with the flow, rather than voice any more opinions or thoughts or what I feel or what I want examined. I don't think I could do that anymore. It's taken its toll. It really has.

THE COURT: I can see it in your face, and we can all hear it in your voice.

JUROR # 2: I'm sorry. I really apologize.

THE COURT: [Juror # 2], please, understand this. You don't have anything to apologize for. Okay? I want you to understand that. You don't have anything to apologize for. Everybody—and that includes you and everybody else—have been a trooper for so long. You guys have been so terrific to stick with it, and you have nothing to apologize for. I'm telling you that from my heart, and I know that I speak for everybody in this room. You have nothing to apologize for. (6/14/02 Tr. at 3579–84).

At this point, I excused Juror # 2 to consult with counsel. The Government stated that the juror had expressed views that might be different from those of everyone else, but suggested that she had not clearly stated that she could not fulfill her role as a deliberating juror. Counsel for defendant Samet concluded that she was a dissenter, since she contrasted herself with everyone else. I granted the Government's request for clarification of the juror's position on discharging her duty and called her in for a second voir dire. It went as follows:

THE COURT: I need to clear some things up, so we'll try to be real specific. When you said just one person—the very first thing you said, I asked you if you were feeling abused, and you said just one person. Did you mean that just one person was being abusive to you?

JUROR # 2: Right.

THE COURT: Correct. Okay. Obviously, it's not appropriate. It happens

that people get testy, but it's not appropriate. Would it help matters if I were to talk to whichever juror was being abusive, and to explain to that juror that, in kind of a general way, that that sort of conduct is not appropriate?

JUROR # 2: The other jurors kind of took care of that for me. That's not the whole issue. It's more of—see, I can't talk about it. It's—

THE COURT: Okay. Fine. Do you feel that you have been deliberating, that is, considering the evidence, talking to the other jurors, keeping an open mind, listening to what they have to say?

JUROR # 2: Yes, mm-hmm.

THE COURT: Do you feel that, especially if I gave a little cooling-off period, if I instructed everyone that that was the way it was supposed to be, and everyone was to deliberate in that fashion, that you would be able to follow my instruction and, specifically, that you would not do what you said earlier you would be inclined to do, which is just go with the flow?

JUROR # 2: I don't think so. Let's see if there's any way I can put this in words without giving anything away. But like, if we look at charges for one case, we should be looking at that in itself, and not digging through other things, trying to come up with, I mean, its just—it's like searching and searching to find somewhere something else that might tie this here or that. It's ridiculous what's going on. I don't think it's fair.

THE COURT: You sort of have a different concept of what it means to deliberate than the other jurors do?

JUROR # 2: Yeah. It's—I don't think it's going to be settled until it's all one way and only one way, and we're going to keep going until they find that.

THE COURT: Might be, might not.

JUROR # 2: Everybody. And if they do decide another way, they'll come back to it later. No, it's got to be this. No, I can't. I can't work like that.

THE COURT: Okay. At the beginning of the case, you and everybody else said that you would follow my instructions whatever they were.

JUROR # 2: Mm-hmm.

THE COURT: You promised. I know sometimes it's hard to keep that promise. One of the instructions that I gave at the beginning, that I gave at the beginning of deliberations and that I give in every single case is that you're to go into the jury room, you're to listen to everybody else, you're to hold to your own views, if they're your own views, and you're to be persuaded only if somebody can persuade you otherwise. That's what I told everybody. Maybe that's what I have to tell everybody again. But that's an instruction that I gave you, to be a deliberating juror, go through the evidence, listen to other people, you give them your views. And in the end, it's your own decision. I give you that instruction again. Can you follow that instruction?

JUROR # 2: No, I don't think so. Not anymore. I'm sorry. I just—I just can't. (6/14/02 Tr. at 3590–93).

After the juror was excused a second time, the Government moved for her dismissal under Rule 23(b), citing *United States v. Baker,* 262 F.3d 124 (2d Cir. 2001).[2] As *Baker* involved a situation

**2.** Contrary to several press accounts, the Government at no time sought to have an alter-

where a juror simply refused to discuss the case or to deliberate at all after only one half hour in the jury room, I did not find it particularly apposite. Defendant Samet's counsel rearticulated his view that the juror was a dissenter, and then went further. He said, "This juror has told you there is a deadlock, they are split 11 to 1. If you remove the juror you are in essence directing the entry of a verdict. That cannot be done. This Court cannot circumvent a deadlock." (6/14/02 Tr. at 3595).

After further colloquy, in which counsel for defendant Hollender indicated that a cooling off period might help resolve the situation, I brought the juror in a third time and told her to go home and think about what we had talked about earlier, including the fact that part of her duty was to hold to her own convictions:

THE COURT: Hi. Have a seat. We're going to send you home for today. I sent everybody home. I'm not discharging you today. I need you to come back on Monday morning. I have to talk to the lawyers. I need some time, so I want to think about what you said, and I want you to think, also, over the weekend about what I said about the juror's duty being to deliberate, to listen, to talk, to reason, to change your mind if

you're persuaded, and to hold your own view even if you're in the minority, if you're only one person, to hold your own views if they're really and truly your views. All of that, every bit of that is part of a juror's duty, and every bit is as important as every other part. And so you come back Monday morning. And why don't you be here by 9:30. Okay? And we're going to have to start late Monday, anyway. You be here by 9:30. We'll talk then. Get some rest over the weekend. I know this is very stressful, and we all feel terrible about that. We really do. And just remember, you don't have anything to apologize for. Everything is fine. Everything is fine. (6/14/02 Tr. at 3602–03).

Although no question of any sort was pending at that moment, the juror blurted out: "I have already changed a couple of votes against my gut. I just can't be fair. I'm sorry." (6/14/02 Tr. at 3603).[3]

As soon as the juror left for the day, the Government renewed its motion for discharge. The defense asked for the weekend to do research. The Court sent the rest of the jury home after telling them that Juror #2 was ill and could not deliberate that day—a true statement, since throughout the morning, the Juror was pasty-faced (in contrast to her usual ap-

nate juror seated. Citing the Second Circuit's disapproval of that practice, it consistently urged that I discharge the juror and proceed to verdict with the remaining eleven.

**3.** I categorically reject Samet's suggestion that the three voir dire sessions with Juror #2 constituted "dynamiting" her. As the Second Circuit has recognized, voir dire of a juror in a sensitive situation like this one is extremely difficult. *United States v. Thomas*, 116 F.3d 606 (2d Cir.1997), citing *United States v. Hernandez*, 862 F.2d 17 (2d Cir. 1988). Samet's counsel specifically requested that I ascertain whether the juror would abide by her oath and carry out the functions

of a deliberating juror. (6/14/02 Tr. at 3574). Even if he had not done so, I had little choice but to address her on that subject, since I had listened to her recorded statements, in which she said, "I can no longer be fair" and "I will vote the same as everyone else." Moreover, Mr. Burstyn mischaracterizes my statements to the juror. Reminding a juror, gently but firmly, that holding to her convictions is an essential part of her duty as a juror—in essence, telling her that it's all right to hang the jury—is the antithesis of giving her an *Allen* charge. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

pearance), fearful, barely able to speak, and emotionally overwrought to the point of tears.

Over the weekend, both defendants moved for a mistrial. The Government argued against a mistrial when Court reconvened on Monday morning, June 17. After hearing from all parties, I again queried Juror # 2, who had been kept segregated from the other jurors (she was told to report at 9:30 A.M.; the other jurors were to arrive at 10:00 A.M.). This last voir dire was quite brief:

THE COURT: Hi, [Juror # 2], how are you doing today?

JUROR # 2: About the same.

THE COURT: Okay. Have you—I asked you over the weekend to think about what I had said on Friday.

JUROR # 2: Yes.

THE COURT: And my question to you is really a very simple question, it's a yes-or-no question, and it really calls for nothing other than a yes or no—

JUROR # 2: Okay.

THE COURT:—and is: Can you follow my instruction that you go back into the jury room and deliberate? Which means you have a give-and-take with the other jurors. In the end, you decide the case for yourself, even if that means you don't agree with the other jurors. In the end that means you decide the case for yourself after listening to their views of the evidence. That's what a juror's job is. Can you do that?

JUROR # 2: No.

THE COURT: You still feel the same way that you felt on Friday.

JUROR # 2: Can I give an explanation?

MS. BARTON: Your Honor—

THE COURT: Yes or no, that was all I wanted. All I wanted. Thanks, [Ju-

ror # 2]. Why don't you take her back. (6/17/02 Tr. at 24–25).

After excusing the juror, the Court delivered an oral opinion denying the Government's motion under Rule 23(b) and granting the motion for a mistrial. At the time, I indicated that a more polished written opinion would follow.

## DISCUSSION

Rule 23(b) gives a district court unilateral discretion to remove a juror for just cause after deliberations have begun, and to proceed to verdict with eleven deliberating jurors. The rule came in response to cases in which a juror became seriously incapacitated or was otherwise unable to continue service upon the jury after a trial of significant length and involving substantial expense. Fed.R.Crim.P. 23(b) Advisory Committee Notes. The Rules provide an alternative short of mistrial in such cases, and does so without calling for the use of alternate jurors once deliberations have begun—an option that the Advisory Committee expressly rejected. Rule 23(b) has been held not to work a violation of the Sixth Amendment right to trial by jury. *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930).

Rule 23(b) has been invoked in a variety of cases, from one in which a juror left on a business trip in mid-deliberation, *United States v. Reese*, 33 F.3d 166, 172–73 (2d Cir.1994), to a case where a juror could not continue deliberations on a religious holiday, *United States v. Stratton*, 779 F.2d 820 (2d Cir.1985), to a case where a juror refused to participate in deliberations at all, *United States v. Baker, supra.*, 262 F.3d 124, to a case where the juror became ill during deliberations, *United States v. Wilson*, 894 F.2d 1245, 1249–51 (11th Cir.), cert. denied, 485 U.S. 990, 108 S.Ct. 1297, 99 L.Ed.2d 507 (1988), to a case where the juror became emotionally unstable, ner-

vous and upset, *United States v. Molinares Charris*, 822 F.2d 1213, 1222–23 (1st Cir.1987). Just cause also encompasses situations in which a juror is incapable of rendering an impartial verdict, either because of threats, *United States v. Ruggiero*, 928 F.2d 1289, 1300 (2d Cir.1991), *cert. denied sub nom Gotti v. United States*, 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991), or because the court learns about a relationship between the juror and one of the parties, *United States v. Barone*, 846 F.Supp. 1016, 1018–19 (D.Mass., 1994), or because of a change in the juror's life circumstances that affect her impartiality, *United States v. Egbuniwe*, 969 F.2d 757, 762–63 (9th Cir.1992).

There is no question in my mind that Juror # 2 could not continue to deliberate. She was in acute physical and emotional distress, to the point that she was willing to vote against her conscience and unwilling to follow my instruction that she hold to her own sincerely-held views. So she was a clear candidate for Rule 23(b) discharge. And I would have discharged her under that rule, but for the fact that she told us enough to reveal that the source of her distress was some difference of opinion between her and the other jurors.[4]

In this Circuit, there are two situations in which Rule 23(b) cannot be invoked. The first, of course, is so obvious as not to require citation: the Rule cannot be used "for the purpose of obtaining a unanimous verdict." *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir.1988). The second is closely linked to the first; it is, "where the record evidence discloses any possibility that a complaint about a juror's conduct stems from the juror's view of the sufficiency of the government's evidence." *United States v. Thomas*, 116 F.3d 606, 622 (2d Cir.1997).

The facts in which the *Thomas* rule was announced bear repeating. In that case, Juror # 5 appeared to his fellow jurors—or at least to some of them—to be engaging in the pernicious practice of juror nullification. During deliberations, Juror # 6 sent out a note indicating that Juror # 5's predisposed disposition made the jury unable to reach a verdict. In voir dires, despite the district judge's care not to ask for anyone's view, five of the jurors revealed that Juror # 5 was adamant for acquittal. All offered different reasons why Juror # 5 felt this way—some couched his objections in terms of the evidence and its sufficiency or reliability, while others relied on alleged statements about race and economics and the commonplace nature of drug dealing that would indicate the possibility of juror nullification of the court's instructions of law. When Juror # 5 was questioned, he did not indicate any unwillingness to follow the

---

**4.** I cannot say what the difference of opinion was about. Indeed, I cannot say that the difference of opinion would have prevented us from obtaining a partial verdict. After three-plus days of prescient questions and uneventful deliberations, it seems fair to infer that the jurors might have reached a verdict on some counts. However, as articulated in *Thomas*, the Second Circuit places a great premium on preserving juror secrecy—anomalous as that may seem in a week when jurors in the most celebrated criminal case in the country held a post-verdict press conference *in the courtroom*, at which they dissected every detail of their deliberations for the waiting world. *United States v. Arthur Andersen*, No. H–02–0121 (S.D.Tex.2002). Because we value juror secrecy so highly, I was unable to learn whether the problem related to all counts or just a few. And when the juror told me that she had changed her vote on a "couple of counts" against her conscience, I could not, consistent with preserving juror secrecy, delve into whether her behavior had tainted all or just part of the jury's deliberations. Given the amount of time, effort and expenditure that went into this trial, this is an unfortunate result, if inevitable, after Judge Cabranes' opinion in *Thomas*.

law. Rather, he indicated an unwillingness to convict unless he heard substantive evidence establishing guilt beyond a reasonable doubt. Nonetheless, the Court dismissed the juror, finding that the juror was engaged in nullification in favor of his preconceived cultural, economic or social views about drug dealing.

The Second Circuit—after ruling that juror nullification could indeed constitute "just cause" for Rule 23(b) dismissal of a juror—concluded that the district judge had improperly exercised his discretion to remove the juror. In so doing, it announced the bright line rule set forth above. The Circuit stated that it was adopting this rule "as an appropriate limitation on a juror's dismissal *in any case* where the juror allegedly refuses to follow the law." *Id.* at 622 (Emphasis in original). And in a footnote, the court indicated that the rule applied, not only where the juror's conduct might be grounded in the sufficiency of the Government's evidence, but on anything touching the merits. *Id.*, at n. 11.

The Second Circuit acknowledged that it was setting up a high evidentiary standard for removal. But the Court indicated that it wanted to protect holdouts from fellow jurors who have come to the conclusion that the holdouts are acting lawlessly. It stated that, if the rule were otherwise, a group of jurors favoring conviction could trigger removal of a juror simply to reach a unanimous verdict. And the Circuit carefully extended the rule to situations where the dissenting juror herself raised the issue of her removal, although that was not the situation confronting it.

The *Thomas* rule was adopted wholesale from the rule announced by the District of Columbia Circuit in *United States v. Brown*, 823 F.2d 591 (D.C.Cir.1987). That case, like this one, involved a multi-count, multi-defendant RICO indictment. After

five weeks of deliberation, one juror—the one in the position of Juror # 2—sent in a note to the court saying, "I am unable to discharge my duties as a juror." On a very careful voir dire by Judge Spotswood Robinson, the court learned two things. It learned that the juror had problems with the way the RICO conspiracy act reads— so that "if I had known at the beginning of trial what the act said I would have not said I could be impartial." And it also learned that he had problems with the evidence. *Id.*, at 597. The juror was careful not to reveal how the jury stood on any count in this multi-count indictment case. Indeed, in *Brown* there is far less information available about the state of the jury's deliberations than there is here; we know, as the court in *Brown* did not, that Juror # 2 disagrees with her fellow jurors on some matters and has changed her vote on a couple of counts in violation of her oath.

The Government argued in *Brown* that the juror should be discharged under Rule 23(b) because he could not follow a law with which he disagreed. The defense countered that the juror really had problems with the evidence. Judge Robinson discharged the juror pursuant to Rule 23(b). It took the jury of 11 three additional weeks to reach a verdict, and the defendants were not convicted on all counts. Thus, one could not, with 20–20 hindsight, conclude that the discharged juror was the only impediment to a verdict. Nonetheless, the D.C. Circuit reversed the convictions because of an abuse of discretion under Rule 23(b), articulating the rule that was later adopted in *Thomas*.

There is a critical difference between this case and the facts of *Thomas* and *Brown*. In those opinions, there is no indication that the recalcitrant jurors were either physically or emotionally incapacitated, or that they were not willing to abide by the Court's instruction to contin-

ue deliberating in fidelity to their oaths. In other words, those jurors could have been sent back into the jury room. I did not have that option. Juror # 2 could no longer function as a juror. She was physically and psychologically impaired, and she categorically refused to follow her oath. She stated repeatedly that she would "go with the flow" because she could not take it any more. She said she would not raise questions or participate in discussion and would vote with "everyone else." And she was fearful of confronting her fellow jurors.[5] She appeared to the Court to be on the verge of a nervous breakdown. Rule 23(b) was, in theory, made for her situation.

But the reason she could not function was her inability to withstand the pressure of being in the minority. Knowing that, does the rule of *Thomas/Brown* preclude me from dismissing her and proceeding with eleven jurors?[6]

Counsel labored long and hard and came up with only one factually apposite case, *Perez v. Marshall,* 119 F.3d 1422 (9th Cir. 1997), a § 2254 habeas case. In *Perez,* after a California state jury had deliberated for only one half hour, a juror asked to be removed from the jury. She told the judge that she was the lone holdout for acquittal and that everyone was angry and stressed. The judge conducted a voir dire of the recalcitrant juror in which he offered to do virtually the same things I suggested to Juror # 2 in an effort to calm matters down. The judge also voir dired

the foreperson. He revealed that the jurors had prevailed upon the holdout to change her mind, but that she reversed herself again and thereafter could not participate in rational discussion. The trial judge then excused the juror, noting for the record that she appeared to be emotionally out of control. Pursuant to a California statute, an alternate was called in, deliberations began anew, and a conviction was reached and affirmed by the State courts.

The Ninth Circuit, reviewing the question on habeas, ruled that Petitioner's Sixth Amendment right to trial by jury was not violated by the dismissal of the lone dissenting juror. It held that the juror—who sounds like she appeared quite similar to our Juror # 2—could be dismissed for good cause because of her emotional state. It then ruled as follows:

> The fact that the trial judge knew that Robles was the sole juror holding out for an acquittal when he dismissed her does not invalidate his decision to excuse her from jury service. The Fifth Circuit has upheld the removal of jurors for cause, even where the court knew that the removed juror was holding out for acquittal. [...] As the district court noted, 'Nothing in the record indicates that the trial court's discretion was clouded by the desire to have a unanimous guilty verdict.' In fact, the record shows that the district court was forced to act, not because of Robles's status as a holdout juror, but because of Robles' emotional

---

**5.** Initially, Juror # 2 indicated that she was being abused in the jury room. When I questioned her about this issue, she stated that only one juror was involved and that the other jurors had taken care of this matter. I expressly find that the juror was not intimidated or abused by her fellow jurors.

**6.** On the day the issue arose, I asked counsel to consider the possibility of my taking a

partial verdict, since the juror had merely indicated that she would vote with everybody else (i.e., in the future) if she were forced back into the jury room. Five minutes later, that became impossible, when the juror blurted out—in response to no question at all—that she had already changed a couple of votes against her conscience.

inability to continue performing the essential function of a juror-deliberation. After Robles blurted out the juror deadlocked stance on Perez's guilt, the trial judge was faced with limited alternatives. He could not order the jury just to continue deliberations, because Robles was emotionally unable to continue deliberating. He also could not sua sponte order a mistrial because jeopardy had attached and absent a finding of manifest necessity, the Double Jeopardy Clause of the Fifth Amendment would have precluded the State from trying Perez before a new jury. A finding of manifest necessity under these circumstances is indistinguishable from a finding that good cause justified excusing Robles from the jury.

*Perez,* 119 F.3d at 1427 (citing *United States v. Huntress,* 956 F.2d 1309, 1313 (5th Cir.1992) (fact that removed juror was a holdout did not 'raise a red flag'); *United States v. Leahy,* 82 F.3d 624, 629 n. 4 (5th Cir.1996) ('Evidence that a juror was holding out ... does not alter the trial court's discretion in removing the juror.').

The holding in *Perez* rests on a shaky premise. In determining that the judge's knowledge of the juror's status as a holdout did not prevent her removal, the Ninth Circuit specifically relied on two Fifth Circuit cases: *Huntress,* 956 F.2d 1309, and *Leahy,* 82 F.3d 624. However, in both of those cases, the juror's alleged status as a holdout was a matter of conjecture, and the "red flag" statement quoted by the Ninth Circuit was no more than dictum. *Huntress,* 956 F.2d at 1313.

In *Huntress,* the Fifth Circuit ruled that defense counsel's 'lone holdout' theory "is pure speculation with no support in the record." *Id.* at 1313. And it cited with approval a prior decision of its sister circuit, *United States v. Wilson,* 894 F.2d 1245 at 1250 (11th Cir.), *cert. denied sub*

*nom Levine v. United States,* 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990), in which a Rule 23(b) removal was upheld because "the record does not present even the slightest basis to believe that this juror was a holdout juror or that the jury had reached any sort of impasse in its deliberations." *Huntress,* 956 F.2d at 1313.

*Leahy,* too, involved speculation over the juror's views on the merits. The juror who was removed in *Leahy* was found to have a severe hearing impairment after deliberations began. The Circuit stated, "[h]is refusal to deliberate could have been, as the district court found, the result of his inability to hear, and not his conviction about the case." *Id.*

However, *Perez, Leahy* and *Huntress* all posit that a juror's holdout status does not raise an automatic red flag. After careful consideration, I conclude that the Second Circuit would not adopt the same point of view.

While the Second Circuit has never confronted a situation quite like the one presented here, its jurisprudence on the question of removing a dissenting juror has been remarkably consistent. In *United States v. Stratton,* 779 F.2d 820 (2d Cir. 1985) and *United States v. Wilson,* 894 F.2d at 1250, *cert. denied sub nom Levine v. United States,* 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792, the Court affirmed a juror's dismissal only because the record did not reveal the "slightest basis" to believe that the removed juror was a holdout. And in *Thomas,* although it did not need to comment on the issue (having disposed of the case on other grounds), Judge Cabranes went to great pains to observe that a juror could in no circumstances be removed to break a deadlock. This strongly suggests that, whatever the state of the law in the Fifth and Ninth Circuits, a juror's status as a holdout puts up a "red

flag" in this one. *Huntress,* 956 F.2d at 1313.

I also find *United States v. Hernandez,* 862 F.2d 17 (2d Cir.1988), to be instructive. In *Hernandez,* there were questions about the behavior of one juror (Juror # 4) throughout the trial. Within an hour after deliberations began, the other eleven jurors sent Judge Bartels a note saying that this juror "has a prejudice and lacks the rational common sense to deliberate in a logical way." *Id.,* at 20. They also revealed that the juror wanted to start a conspiracy case against the Government. The jurors asked that Juror # 4 be replaced by an alternate. The Court denied a defense motion for a mistrial and refused both the Government's request that the juror be removed and its suggestion that he be examined by a psychiatrist.

A second note followed shortly thereafter. It seemed to indicate that the problem was that the Juror # 4 held a different view of the evidence than did the other panelists. However, the note also revealed more bizarre behavior on Juror # 4's part, including violence directed against the other jurors. Nonetheless, after receiving the foreperson's assurance that the jury could deliberate in a calm and rational manner, the court denied motions for removal (by the Government) and mistrial (by the defendant), and the jurors went forward.

On the second day of deliberations Judge Bartels revealed that he had learned through his clerk that Juror # 4 had been discharged from the Navy due to psychological problems. However, things were quiet in the jury room, and so he declined to explore that issue in favor of waiting to see if the jury could reach a verdict. Two days later, the other jurors renewed their complaints about Juror # 4's mental state and his inability to understand the evidence. It was clear from the tenor of the other jurors' notes that Juror # 4 was the sole holdout for acquittal. Nonetheless, after voir diring Juror # 4 about his mental history, the judge removed him pursuant to Rule 23(b). The Second Circuit held that this was error, because it could not be confident that the juror was not removed to break the deadlock, rather than because of his inability to deliberate. Because other reversible errors had infected the proceedings, the Court of Appeals did not remand for clarification.

Of course, *Hernandez* is hardly a perfect fit with this case. However, in that case a judge was reversed after discharging a juror who was not mentally competent to continue deliberations four days into deliberations, at a time when it was clear "from the tenor of the record" that the juror was deadlocking the jury. That is precisely what happened here. The only substantive difference is that here the juror herself raised the issue, whereas in *Hernandez* the other jurors did so. After *Thomas,* this is not a difference that makes a difference.

The Government contends, without citation to any authority, that the reason why the juror becomes psychologically unable to deliberate "is fundamentally simply irrelevant to the analysis." (Letter dated June 15, 2002 at 6.) That was indeed the Ninth Circuit's conclusion in *Perez.* But the same cannot be said in this Circuit, where a juror's status as a holdout *is* a "red flag" that will result in the closest scrutiny of the District Court's decision to discharge the juror. *United States v. Thomas,* 116 F.3d 606.

A fair reading of this record—the only fair reading, I fear—is that the juror became unhinged by the process of deliberation. But the part of the process that unhinged her was holding out, at least on some counts. In such a case, Second Circuit precedent suggests that Rule 23(b)

must give way to the greater imperative of not removing a juror whose views on the merits place her in the minority. Or, to return to the analogy with which I began this opinion, in this Circuit, when Rule 23(b) meets the rule of *Thomas*, it is Rule 23(b) that must yield.

Because I can neither dismiss Juror # 2 under Rule 23(b) nor permit her to continue deliberating, I must declare a mistrial.